**United States District Court**

**Eastern District of Pennsylvania**

| | | |
|---|---|---|
| **CHRISTOPHER O'BRIEN-VISSER** | : | |
| Plaintiff | : | |
| v. | : | No. _______________ |
| **OXFORD HEALTH INSURANCE, INC.**, | : | |
| **UNITEDHEALTH GROUP, INC.**, | : | **JURY TRIAL** |
| **UNITEDHEALTHCARE, INC.,** | | **DEMANDED** |
| **and PVERIFY, INC.** | : | |
| Defendants | : | |

**COMPLAINT**

Plaintiff, Christopher O'Brien-Visser, individually, brings this action against Defendants Oxford Health Insurance, Inc., UnitedHealth Group, Inc., UnitedHealthcare, Inc. (collectively "UHC" or "UHC Defendants"), and pVerify, Inc. (collectively "Defendants") pursuant to the Federal Civil Rackateer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c):

**INTRODUCTION**

1. UHC Defendants are the largest healthcare and health insurance company in the United States. UnitedHealth Group brags about its $8,000,000,000 Earnings from Operations in its 2026 Second Quarter alone and a 2026 Earnings Outlook of $19.50 to $20.00 per share. [1] United Healthcare is embroiled in numerous lawsuits around the country

[1] *See* https://www.unitedhealthgroup.com/newsroom/2026/2026-07-16-uhg-reports-second-quarter-2026-results.html

for fraudulent activity, such as recent filing by Massachusetts who alleges that United Healthcare defrauded the state's Medicaid program out of at least $100,000,000 by upcoding, classifying members as having health conditions without meeting proper criteria.[2] UnitedHealth has also been investigated by the United States Department of Justice in relation to possible criminal fraud in its Medicare program.[3] But UHC Defendants' greed knows no bounds and is not limited to taxpayer funded programs. In fact, the Department of Justice has also investigated UnitedHealth in relation to growing concerns about United Health's vertical integration efforts to acquire medical providers so that UnitedHealth can essentially sidestep regulations capping how much in members' premiums they can retain in profit.[4] Perhaps most egregious is UHC Defendants' exceedingly high claim denial rates, consistently ranking among the highest denial rates in the entire industry.[5] UHC Defendants' are being sued in a Class Action Lawsuit which alleges UHC Defendants illegally deployed artificial intelligence (AI) to wrongfully deny patients care systematically, using an AI model with a known 90% error rate, in a fraudulent scheme, knowing that only roughly .2% of policyholders will appeal denied claims.[6]

2. Plaintiff's claims in this lawsuit also arise from the Defendants' use of AI and/or data algorithms to deny claims illegally, repeatedly, intentionally, and fraudulently, including conspiring and racketeering between UHC Defendants and pVerify to do so. Specifically,

[2] https://bhbusiness.com/2026/06/01/massachusetts-sues-unitedhealthcare-over-100m-in-alleged-medicaid-fraud-patient-misclassification/
[3] https://www.healthcaredive.com/news/unitedhealth-under-investigation-department-of-justice-medicare/753913/
[4] https://www.healthcaredive.com/news/unitedhealth-antitrust-investigation-doj-unitedhealthcare-optum/708727/
[5] https://www.forbes.com/sites/amyfeldman/2024/12/05/unitedhealthcare-denies-more-claims-than-other-insurers---angering-patients-and-health-systems/
[6] https://litigationtracker.law.georgetown.edu/wp-content/uploads/2023/11/Estate-of-Gene-B.-Lokken-et-al_20231114_COMPLAINT.pdf

between 2024 to 2026 and currently continuing, UHC Defendants have intentionally, maliciously, and knowingly denied payment on Plaintiff's medical claims citing Coordination of Benefits using an Aetna policy that UHC Defendants identified in partnership with pVerify in a conspiracy to defraud Plaintiff out of premiums and benefits contractually owed in efforts to unjustly enrich themselves at the expense of Plaintiff and Plaintiff's medical providers. Plaintiff attempted to resolve claim denial issues with UHC Defendants unsuccessfully prior to a 2024 inquiry by New York's Department of Financial Services ("NY DFS"), the regulatory agency that oversees this New York based fully insured program offered by UHC Defendants which Plaintiff subscribed and paid premiums for. UHC Defendants proceeded to materially misrepresent their investigation into the claims, misrepresented that all claims had been reprocessed correctly, and misrepresented that a fix had been put in place in UHC Defendants' written response to the regulators investigating UHC Defendants' unlawful and fraudulent behavior. As documentation shows, UHC Defendants' own written admissions indicate that they used data from pVerify to incorrectly associate this Aetna policy, held by an individual with a completely different last name, different address, and different social security number, with Plaintiff.

3. UHC Defendants' first material misrepresentation to NY DFS investigators was on December 12, 2024, in which UHC Defendants claimed they confirmed they updated the Coordination of Benefits to correctly reprocess a claim for a date of service June 21, 2024 which they had initially improperly denied. In this December 12, 2024 response to NY DFS, UHC Defendants stated *"... and I have confirmed that no other claims were impacted from this error."* [emphasis].

4. However, when UHC Defendants again denied payment on numerous of Plaintiff's medical claims in 2025 for the very same Coordination of Benefits "error", Plaintiff discovered there were claims from August 2023 and March of 2024 for a different medical provider also impacted which UHC Defendants intentionally did not address nor disclose to NY DFS regulators, in an effort to conceal their systemic and fraudulent conduct designed to profit by way of defrauding Plaintiff, thereby causing substantial financial harm to Plaintiff. In response to NY DFS's subsequent 2025 investigation, following UHC Defendants' second blanket intentional denial of numerous medical claims based on information UHC Defendants' had already previously admitted they were aware was incorrect, UHC Defendants made even more misrepresentations to NY DFS agents tasked with investigating UHC Defendants' conduct. Specifically, on November 5, 2025, UHC Defendants' response again admitted that the individual associated with the Aetna policy has a completely different last name, different social security number, and different address, yet they proceeded to update the Coordination of Benefits to improperly deny Plaintiff's claims. In this same November 5, 2025 response, UHC Defendants represented that they had documented Plaintiff's account to prevent recurrence and implemented an audit rule on Plaintiff's account so that manual adjuster review would prevent any additional claims from being denied for an Aetna Coordination of Benefits issue. Enclosed with this November 5, 2025 response was a letter from UHC Defendants dated June 13, 2024 [emphasis] to one of Plaintiff's medical providers demanding repayment of services rendered in August 2023 and March 2024.

5. This is significant because, as noted previously, on December 12, 2024 UHC Defendants represented to NY DFS that they had verified that no other claims were impacted by this Coordination of Benefits error. However, the June 13, 2024 letter from UHC Defendants demanding repayment from Plaintiff's providers for 2023 and 2024 claims was issued *prior* to UHC Defendants' December 12, 2024 response to NY DFS investigators. This is significant because it establishes that UHC Defendants misrepresented their investigation and corrective efforts to NY DFS investigators and misrepresented that no other claims were impacted in order to conceal systemic and intentional conduct designed to defraud Plaintiff. It was not until the 2025 NY DFS investigation into UHC Defendants' second year of intentional and fraudulent conduct in efforts to deny payment of Plaintiff's medical claims that UHC Defendants corrected the 2023 and 2024 claims. UHC Defendant's pattern of deceitful and intentional action to defraud was already apparent, but NY DFS closed their 2025 investigation upon receipt of UHC Defendants' response promising this would not happen again.

6. Notably, UHC Defendants also made these same misrepresentations to New York's Office of Attorney General as well on December 18, 2025 and Pennsylvania's Office of Attorney General on November 10, 2025. In other words, UHC Defendants made these material misrepresentations to no less than three (3) separate regulatory agencies investigating UHC Defendants' conduct. UHC Defendants committed mail and wire fraud with their written and mailed responses to regulators, letters to providers demanding payment, and by receiving funds that UHC Defendants clawed back or demanded from providers as a result of their fraudulent conduct.

7. Nevertheless, on August 17, 2026 Plaintiff again became aware of UHC Defendants' efforts to deny payment on Plaintiff's medical claims citing Coordination of Benefits for the same Aetna policy associated with the other individual which UHC Defendants have on numerous prior occasions admitted to knowing was not associated with Plaintiff, including in writing to numerous government regulators. Immediately upon discovery this was occurring yet again, Plaintiff called UHC Defendants and UHC Defendants' representatives acknowledged the erroneous Aetna match but insisted Plaintiff would need to file individual appeals on each of the dozens of previously paid claims that UHC Defendants had placed in queue to reprocess with Aetna as primary to claw money back and/or demand payment from Plaintiff's medical providers throughout 2026. This is consistent with years of Plaintiff's contact efforts with UHC Defendant's support lines with regard to these issues – representatives who are combative, argumentative, unable to resolve issues, often refuse to transfer to supervisors, and even while admitting their own clear and known errors on recorded lines, the training and scripts for line level representatives is designed to weaponize UHC Defendants' processes to coerce policyholders to give up. UHC Defendants' conduct, including generally predatory and weaponized customer service but more importantly numerous materially false statements to investigating regulatory bodies, has established a clear pattern of systemic conspiracy to defraud Plaintiff out of benefits owed under an insurance plan for which Plaintiff paid significant premiums for, in order to unjustly enrich themselves. Shockingly, as recent as August 25, 2026, UHC Defendants continue to deny Plaintiff's appeals on claims regarding this very issue forcing Plaintiff to file this lawsuit.

8. Plaintiff's story is unfortunately not unique. Defendants' systemic, willful violations of federal and state laws designed to protect consumers led to the exact result that Defendants wanted – to unjustly enrich themselves by defrauding hard working American consumers like the Plaintiff.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1964(a) (RICO jurisdiction) and 28 U.S.C. § 1331 (federal question jurisdiction).

10. This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1391(b) because the Plaintiff submits to the jurisdiction of the Court, the Defendants systematically and continually conducted business within the Commonwealth of Pennsylvania by advertising, marketing, promoting, soliciting, and selling products and services directly and indirectly to Pennsylvania residents, and administers claims for services rendered to Plaintiff in Pennsylvania by medical providers in Pennsylvania.

11. Venue in this jurisdiction is proper pursuant to 18 U.S.C. § 1965(a) because all Defendants regularly conduct business in Chester County, Pennsylvania, the cause of action arose in Chester County, and the Plaintiff resides in Chester County. Even if pVerify, Inc. is found not to conduct business in Pennsylvania, venue in this jurisdiction is proper pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that this multi-state RICO enterprise be litigated in single judicial district and no other single district exists where all defendants reside.

## THE PARTIES

11. Plaintiff**, Christopher O'Brien-Visser**, was at all times relevant to this action a citizen of the Commonwealth of Pennsylvania, in Montgomery County in 2023 – August of 2024, and Chester County from August of 2024 to present. At all relevant times mentioned herein, Plaintiff was covered by a fully insured healthcare policy issued by Defendants and obtained through Plaintiff's New York employer.

12. **Defendant Oxford Health Insurance, Inc.** is a Delaware corporation, headquartered at 4 Research Drive, Shelton, CT 06484. Upon information and belief, Oxford Health Insurance, Inc. is the underwriting company of the subject policy and is a subsidiary of the larger UnitedHealthcare, Inc. entity which offers various health benefit plans to individuals, families, and employers, primarily in New York, New Jersey, and Connecticut.

13. **Defendant UnitedHealth Group, Inc.** is a Delaware corporation, headquartered at 1 Health Drive, Eden Prairie, MN, 55344. UnitedHealth Group, Inc. conducts insurance operations throughout the country. UnitedHealth Group has a license to use the federally registered service mark "UNITEDHEALTH GROUP," markets and issues health insurance and insures, issues, administers, and makes coverage and benefit determinations related to the health care policies nationally through its various wholly owned and controlled subsidiaries, controlled agents and undisclosed principals and agents, including Defendants Oxford Health Insurance, Inc. and UnitedHealthcare, Inc. Defendant UnitedHealth Group is licensed and registered to conduct business in all 50 states, and does conduct business in all 50 states, and is thereby subject to the laws and regulations of all 50 states.

14. **Defendant UnitedHealthcare, Inc.**, incorporated in Delaware, is a wholly owned subsidiary of Defendant UnitedHealth Group, Inc., with its principal place of business at 9800 Health Care Ln, Minnetonka, MN 55343. Defendant UnitedHealthcare markets and issues health insurance and insures, issues, administers, and renders coverage and benefit determinations related to the health care policies. Defendant UnitedHealthcare is licensed and registered to conduct business in all 50 states, and does conduct business in all 50 states, and is thereby subject to the laws and regulations of all 50 states.

15. Defendant **pVerify, Inc.**, incorporated in California, is a wholly owned subsidiary or division of PRN Software LLC d/b/a DoseSpot, with its principal place of business located at 2522 Chambers Road, Suite 201, Tustin, CA 92780. pVerify, Inc. is a healthcare technology company that provides AI powered benefits eligibility software to clients and at all times relevant to this Complaint transacted business in all 50 states.

## FACTUAL ALLEGATIONS

16. UHC Defendants offered and sold a NY Fully Insured Exclusive Provider Organization ("EPO") to consumers, including Plaintiff's employer.

17. In or about June of 2023, Plaintiff enrolled with UHC Defendants to receive health insurance coverage through the offered plan. UHC Defendants encouraged and convinced Plaintiff to sign up for electronic receipt of correspondence. UHC Defendants accepted substantial monetary premiums from Plaintiff and Plaintiff's employer.

18. In or about July of 2024, Plaintiff became aware of UHC Defendants' denial of payment on medical claims EN31985835 and EP65683215 for date of service June 18, 2024 upon receipt of an Explanation of Benefits (hereinafter "EOB") which stated UHC Defendants' "Coordination of Benefits" system was showing an active Aetna policy which UHC Defendants deemed primary, and the EOB directed Plaintiff to call UHC Defendants if Plaintiff was not covered by Aetna.

19. In or about July of 2024, Plaintiff called UHC Defendants as directed and UHC Defendants advised there was nothing UHC Defendants could do and directed Plaintiff to contact Plaintiff's Human Resources department if there was an error.

20. On July 25, 2024, Plaintiff contacted Plaintiff's employer's Human Resources department.

21. Upon information and belief, on or about July 26 2024, a Human Resources representative contacted UHC Defendants to have the issue corrected.

22. On or about July 27, 2024, UHC Defendants contacted Plaintiff by phone and in an accusatory manner questioned Plaintiff about having Aetna, during which conversation Plaintiff asked UHC Defendants' representative to read out the information identified by UHC Defendants' "Coordination of Benefits" system. UHC Defendants read aloud to Plaintiff on UHC Defendants' own recorded line that the individual's last name, address, and social security number associated with the Aetna policy which did not match Plaintiff's last name, address, and social security number. UHC Defendants' tone quickly changed from accusatory to apologetic with promises to correct the issue and reprocess Plaintiff's claims

upon Plaintiff questioning how UHC Defendants' "Coordination of Benefits" system identified this Aetna policy, how UHC Defendants verify these potential matches, questioning if a human reviews matches and/or processes the claims, and Plaintiff's pointing out that this appeared to be bad faith investigation and claim handling. To Plaintiff's detriment, Plaintiff believed UHC Defendants' misrepresentations that the issue was being resolved and claims impacted reprocessed.

23. On or about July 31, 2024, another one of Plaintiff's medical providers advised Plaintiff that UHC Defendants had denied additional claims citing Aetna was primary. Plaintiff advised the provider that UHC Defendants had claimed to have fixed the issue and the provider said they would try to reprocess then.

24. On or about August 19, 2024, the same medical provider advised Plaintiff that UHC Defendants were again denying a new date of service for August 16, 2024, claim EQ19160948.

25. UHC Defendants, despite admitting to Plaintiff on a recorded line on or about July 27, 2024 that the Aetna policy identified by UHC Defendants' "Coordination of Benefits" system had incorrectly identified the Aetna policy as belonging to Plaintiff, UHC Defendants proceeded to knowingly and intentionally subsequently deny payment on Plaintiff's claim number EQ19160948 for date of service August 16, 2024 citing the Aetna policy as primary.

26. In or about August, 2024, Plaintiff again contacted UHC Defendants regarding this issue and again UHC Defendants admitted on UHC Defendants' own recorded line that the Aetna policy was an incorrect match. Again, Plaintiff relied detrimentally upon UHC Defendants' representations that the issue would be resolved and all claims reprocessed.

27. On December 5, 2024, Plaintiff filed a New York Department of Financial Services Complaint # CSB-2024-01624346 regarding UHC Defendants' conduct.

28. On December 12, 2024, UHC Defendants' responded to the New York Department of Financial Services with a written response that admitted the error, represented that the "Coordination of Benefits" issue had been corrected, and **that no other claims other than EN31985835 and EP65683215 for the June 18, 2024 date of service was impacted**. UHC Defendants' written response was by "April M." and states, in part, **"...and I have confirmed that no other claims were impacted from this error."** ***[emphasis.] SEE EXHIBIT A***

29. On September 15, 2025, New York Department of Financial Services relayed UHC Defendants' response to Plaintiff.

30. On October 8, 2025, Plaintiff attempted to refill several necessary prescription medications and was advised by Optum Pharmacy, which is notably owned by Defendant United Healthgroup, Inc., that the order could not be processed because Plaintiff's coverage is within another insurance company.

31. On October 8, 2025, Plaintiff called UHC Defendants who again proceeded to tell Plaintiff that their "Coordination of Benefits" system is showing that Plaintiff has Aetna. UHC Defendants refused to tell Plaintiff where that information comes from. UHC Defendants confirmed the phone lines are recorded. UHC Defendants during this call stated that the Aetna policy began on July 1, 2023, the member ID is W267805208, and that UHC Defendants were notified of this Aetna policy again on September 9, 2025 but refused to say where the information came from. UHC Defendants' supervisor that it was escalated to named Marvin, who would not provide a last name, again admitted that it was incorrect and

provided a "case number" 124646534. Plaintiff requested UHC Defendants mail everything vs electronic correspondence moving forward.

32. On October 8, 2025, Plaintiff filed another New York Department of Financial Services Complaint # CSB-2025-01673010 and New York State Attorney General Complaint # 1-1135312577.

33. On October 9, 2025, UHC Defendant's supervisor Marvin left a voicemail for Plaintiff claiming that the issue has been fixed "on both sides" and that all impacted claims would be reprocessed within 30 days.

34. On October 10, 2025, Plaintiff noticed five (5) other claims for dates of service March 25, 2025 claim FA01850484, April 1, 2025 claim FC32631103, and April 4, 2025 claims FC32631180 and FA39585166 were showing $0 payments made by UHC Defendants.

35. On October 10, 2025, Plaintiff called UHC Defendants again after finding the EOBs for the five (5) other claims referenced in the above line that also stated that *"Our records show you have coverage with another carrier…"* Plaintiff noticed that the EOBs do not clearly indicate that claims are being denied, but rather several pages in is where it is indicated that $0 has been paid and references the *"coverage with another carrier"*. Plaintiff spoke with another of UHC Defendants' supervisors, Andrea, who again confirmed the lines are recorded, that their notes reflected Plaintiff's prior calls, and that she could see in UHC Defendants' "Coordination of Benefits" notes that the person with the Aetna policy is named Christopher Gargone *(spelling?)* with the same date of birth, but a different last name, different Pennsylvania address, and different social security number. UHC Defendants' supervisor, Andrea, admitted that this is clearly an incorrect match, could not explain how

or why this clearly incorrect match keeps flagging as a match, and promised to correct it and reprocess all impacted claims after confirming the aforementioned five (5) claims were impacted. UHC Defendants continued to refuse to send Plaintiff anything in writing or an email to confirm this with specificity despite Plaintiff's requests for same.

36. On October 11, 2025, UHC Defendants sent Plaintiff a letter in relation to claim FH48182955 for date of service September 23, 2025 that states, in relevant part, *"We received your request to review the medical claim listed below... **We confirmed the claim was processed correctly because we are the primary carrier over BCBS-Aetna. This means the claim will not be reprocessed.**"* **SEE EXHIBIT B.** UHC Defendants' previously issued EOB for this claim dated October 6, 2025 confirms that, in fact, UHC Defendants had not paid anything toward the claim and states, in relevant part, *"Our records show you have primary coverage with Aetna. Please send a copy of the Explanation of Benefits (EOB) from Aetna that matches all services on the claim to..."* ***SEE EXHIBIT C***. UHC Defendants, in their letter to Plaintiff dated October 11, 2025, lied to Plaintiff regarding their review and status of the claim and intentionally failed to reprocess the claim despite knowing full well that the Aetna policy was not associated with Plaintiff.

37. On October 14, 2025, Plaintiff notified Plaintiff's employer's Human Resources department of the developments who upon information and belief reached out to Defendant Oxford Health Insurance, Inc. and received a response that Defendant Oxford Health Insurance, Inc. put in a ticket INT-137703144 to determine how "Coordination of Benefits" information is received because it does not originate from them. Plaintiff believes that this ticket was escalated to UHC Defendants and pVerify, Inc. for research and escalation.

38. On October 20, 2025, Plaintiff received a "Health Statement" dated October 10, 2025 from UHC Defendants in the mail. Upon information and belief, this was generated as a result of the reprocessing begun as a result of UHC Defendants' supervisor Marvin's actions on October 9, 2025. This "Health Statement" revealed to Plaintiff that claims for dates of service September 23, 2025, **March 18, 2024** and **August 1, 2023** had previously and continue to be denied payment by UHC Defendants citing "Our records show you have primary coverage with Aetna…" ***SEE EXHIBIT D.*** **[Note that Defendants' written response to the New York Department of Financial Services on December 12, 2024 explicitly stated that Defendants had confirmed that no other claims were impacted.]** ***[Bolded for emphasis.]*** Plaintiff now became aware of UHC Defendants' misrepresentations in their response to New York Department of Financial Services, the regulatory body that oversees insurance companies.

39. On October 21, 2025, Plaintiff advised Plaintiff's employer's Human Resources that Plaintiff has received the aforementioned October 10, 2025 mail and Human Resources said they would follow up with UHC Defendants again to escalate.

40. On October 22, 2025, Plaintiff called UHC Defendants to follow up on ticket # 124646534 in relation to these ongoing issues. UHC Defendant representative Jeff claimed that several claims had been reprocessed correctly but others had not yet been reprocessed. Again, UHC Defendants refused to provide last names or employee IDs, refused to provide an email address for a legal department, advised there is no phone number for the Coordination of Benefits department, and then either intentionally ended or the call dropped when Plaintiff requested to review all prescription drug claims next.

41. On October 22, 2025, Plaintiff sent a Notice to Retain and Preserve Evidence & Demand for Resolution to UHC Defendants by email and mail and called UHC Defendants again. UHC Defendants represented again that the issue was corrected and all claims would be reprocessed, and again refused to send Plaintiff anything in writing to that effect to document. The same day, UHC Defendants' executive assistant named Hayley called Plaintiff to confirm receipt of the Notice to Retain and Preserve Evidence & Demand for Resolution and that she would personally be looking into the issue, having already set up a meeting with the "Coordination of Benefits team".

42. On October 28, 2025, Plaintiff reached out to UHC Defendants via UHC Defendants' chat system requesting all EOBs ever processed since this policy began since UHC Defendants' portal only allowed Plaintiff to view 18 months of history and directed Plaintiff to contact UHC Defendants directly if needing older EOBs. UHC Defendants provided case # 127434199 as UHC Defendants' representative was unable to assist. UHC Defendants provided a turnaround time of October 31, 2025. To date, UHC Defendants has never provided Plaintiff will all EOBs as requests.

43. On November 5, 2025, UHC Defendant's representative Hayley B. emailed Plaintiff directly to advise that *"Oxford requests COB information from members annually … To verify eligibility, we use industry-standard platforms such as Pverify and CAQH…"* UHC Defendant's representative Haley B. went on to explain that *"During a COB review in June 2024, our representative mistakenly identified another individual with similar personal details … this led to an incorrect update to your COB status and reprocessing of several claims."* UHC Defendant's response goes on to admit that *"As a result of the incorrect COB*

*update, a recovery letter was issued to LabCorp Raritan on June 13, 2024, for services dated August 10, 2023, and March 27, 2024. **We received recovered funds in October 2024**.*" [emphasis] **SEE EXHIBIT E**. UHC Defendant's admission here is significant as it establishes that UHC Defendants knowingly accepted a mail or wire refund from medical provider LabCorp Raritan in October of 2024 due to UHC Defendant's fraudulent demand for repayment to LabCorp Raritan dated June 13, 2024 [**SEE EXHIBIT F**], amidst the ongoing dispute and investigation by NY DFS regulators, and then proceeded to represent to NY DFS on December 12, 2024 responding to inquiry regarding different claims EN31985835 and EPN65683215 for date of service June 18, 2024, that UHC had verified that no other claims had been impacted when clearly UHC Defendants knew of other impacted claims. UHC Defendants committed mail fraud by demanding repayment from LabCorp Raritan via their June 13, 2024 letter, and then committed wire fraud by accepting funds from LabCorp Raritan in October, of 2024, and then intentionally withheld that information from investigating NY DFS agents in December of 2024 in concerted effort to continue UHC Defendant's fraud scheme with its co-conspirator, co-Defendant pVerify, Inc.

44. On November 7, 2025, Plaintiff responded to UHC Defendant's November 5, 2025 email, requesting UHC Defendants explain why they misrepresented to NY DFS that no other claims were impacted in their December 12, 2024 response despite the 2023 and 2024 claims being known to UHC Defendants at the time, and also an explanation as to where the October 2024 funds received by UHC Defendants from LabCorp Raritan went, since they were certainly not returned to Plaintiff. To date, Plaintiff has not received a response regarding these inquiries. In this same email exchange, Plaintiff again requested all EOBs

promised by UHC Defendants via ticket # 127872062, since UHC Defendants had failed to provide same, so that Plaintiff could review for any further "errors" made by UHC Defendants. To date, UHC has not responded to this either and Plaintiff has yet to receive all EOBs from UHC Defendants.

45. On November 7, 2025, Plaintiff forwarded UHC Defendant's November 5, 2024 email admitting their repeated conduct and revealed that UHC Defendants failed to disclose the August 10, 2023 and March 27, 2024 claims impacted to the NY DFS investigator in UHC Defendant's December 12, 2024 response to NY DFS. Plaintiff has not received a response to date.

46. On November 5, 2025, UHC Defendants responded to NY DFS again, with substantially the same admissions as referenced above in UHC Defendant's email to Plaintiff on the same date, now including *"…Based on a review of the <u>information obtained in pVerify</u> by our COB representative…"* [emphasis] confirming that they used pVerify to identify the Aetna policy to associate with Plaintiff. UHC Defendant's response included a copy of their June 13, 2024 demand for payment to LabCorp Raritan and reiterated that UHC Defendant's obtained the data from pVerify, failed to investigate, and again promised an audit rule would be put in place on Plaintiff's account to prevent recurrence. **SEE EXHIBIT G**

47. On November 10, 2025, UHC Defendants responded to the Commonwealth of Pennsylvania Office of the Attorney General with a letter that is substantially and substantively the same as their response to NY DFS. **SEE EXHIBIT H**

48. On December 18, 2025, UHC Defendants responded to New York State Office of the Attorney General's office by providing a copy of their response to NY DFS. **SEE EXHIBIT I**

49. On or about August 17, 2026, Plaintiff was advised by a medical provider that UHC Defendants were telling them that Plaintiff had Aetna. Plaintiff then called UHC Defendants and again their representatives refused to provide last name or employee ID, refused to say where this Aetna information was coming from, suggested it comes from the policy holders which Plaintiff immediately refuted, refused to transfer to supervisor, and could provide no resolution, only providing a ticket # 169798743.

50. On August 17, 2026, Plaintiff sent another Preservation Demand and copies of the aforementioned UHC Defendants' prior responses to NY and PA regulators.

51. On August 17, 2026, Plaintiff proceeded to file new NY DFS, NY Attorney General, and PA Attorney General complaints as UHC Defendants' conduct continued.

52. On August 18, 2026, UHC Defendants responded via email generically to Plaintiff advising they will provide an update by August 28, 2026. UHC Defendant's response did not formally acknowledge Plaintiff's Preservation Demand, however references the recent email which contained same.

53. On August 19, 2026, Plaintiff observed a newly processed claim for date of service August 4, 2026 claim # FW86649176 that showed Plaintiff owed a copay/coinsurance, despite Plaintiff having met his out-of-pocket maximum months prior, causing Plaintiff to call UHC Defendants again. UHC Defendant's representative named Bunz, in typical fashion refused to provide a last name or employee ID, confirmed calls are recorded, could not transfer to a supervisor, and said Plaintiff would need to file appeals on each and every claim. Plaintiff also brought up the fact that UHC Defendants had not been mailing EOBs to Plaintiff despite Plaintiff specifically requesting that previously and the settings elected in Plaintiff's

portal, which UHC Defendants control, clearly states EOBs are to be mailed. Regardless, UHC Defendant representative Bunz confirmed that UHC Defendants had updated the Coordination of Benefits with the false Aetna match and had reprocessed claim # FR96052135 for date of service April 7, 2026 to deny payment citing Aetna. UHC Defendant representative Bunz stated that this claim had previously been processed and was the claim that exhausted Plaintiff's out of pocket maximum, but UHC Defendants decided to reprocess the claim to deny payment citing Aetna on August 17, 2026, despite UHC Defendants' admitted knowledge that the Aetna policy is not associated with Plaintiff. UHC Defendant representative Bunz then went on to confirm that UHC Defendants also had in queue to retroactively reprocess to deny all of the following prior claims citing the known false Aetna match:

DOS 04/27/2026 Claim # FT49486895,

DOS 05/11/2026 Claim # FU78147833,

DOS 05/26/2026 Claim # FU49961146,

DOS 06/02/2026 Claim # FV05855282,

DOS 06/04/2026 Claim # FU82082705,

DOS 06/29/2026 Claim # FW62148319,

DOS 06/29/2026 Claim # FV62313173,

DOS 06/13/2026 Claim # FV72417700,

DOS 07/03/2026 Claim # FW51349852,

DOS 07/23/2026 Claim # FW2187584,

DOS 07/29/2026 Claim # FW65021746,

DOS 08/04/2026 Claim # FW86649176,

DOS 08/05/2026 Claim # FX09103357,

DOS 08/05/2026 Claim # FX09880988,

DOS 08/07/2026 Claim # FX09880992, and

DOS 08/10/2026 Claim # FX09880990.

UHC Defendant representative Bunz also advised that additional newer claims that had not been processed previously, that were also in line to be processed. Plaintiff immediately emailed a cease and desist to UHC Defendants to stop reprocessing the above referenced prior paid claims using the false Aetna match in efforts to defraud Plaintiff and Plaintiff's medical providers. Plaintiff also demanded that UHC Defendants immediately reprocess any claims that UHC Defendants had already reprocessed incorrectly, provide all EOBs by mail, and a full accounting of all claims.

54. On August 20, 2026, Plaintiff filed a formal grievance demanding UHC Defendants produce the full claim files, the internal data being used, and algorithms used for all claims impacted. Plaintiff also filed an appeal for DOS August 4, 2026 claim # FW86649176. **SEE EXHIBIT J.** Plaintiff also contacted Human Resources to escalate.

55. On August 20, 2026, UHC Defendant's representative Casey M claimed multiple departments are working on this issue and each of Plaintiffs asks for documentation are answered and delivered correctly.

56. On August 24, 2026, Plaintiff's Human Resources department relayed UHC Defendants' admission that the Coordination of Benefits process is entirely automated and despite the clear and known incorrect match to the Aetna policy associated with an

individual with a completely different last name, different address, and different social security number: *"...the information is being reapplied through an automated Coordination of Benefits review process rather than by an individual manually updating the member's record..."* **SEE EXHIBIT K.**

57. On August 25, 2026, UHC Defendants denied Plaintiffs appeal of DOS August 4, 2026 Claim # FW86649176 despite UHC Defendants' prior admission of their own error reprocessing the April 7, 2026 claim with the incorrect Coordination of Benefits info on August 17, 2026 which caused the erroneous application of co-insurance/deductible on FW86649176 for DOS August 4, 2026 which Plaintiff disputed and appealed at UHC Defendants' direction. UHC Defendants state *"Based on our review of the appeal, we have confirmed that the claim was processed correctly... we looked at the documentation submitted.... Oxford Health Insurance, Inc. correctly processed the referenced claim(s)...The claim(s) will remain as originally processed..."* **SEE EXHIBIT L.** As noted previously, the April 7, 2026 claim had Plaintiff meet their out-of-pocket maximum for the plan year. Plaintiff's appeal included a narrative explaining that the prior claim being reprocessed inaccurately impacted this claim at issue and included supporting documentation, specifically UHC's own response to NY regulators. Despite this and ongoing escalations and promises to fix, UHC Defendants decided to double down and refuses to reprocess the claim correctly.

**<u>COUNT I</u>**

**Federal Civil RICO, 18 U.S.C. § 1962(c) v all Defendants**

58. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

59. Defendants violated RICO and Plaintiff was injured as a result.

60. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

61. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

62. The Enterprise: Defendants Oxford Health Insurance, Inc., Unitedhealth Group, Inc., UnitedHealthcare, Inc., and pVerify, Inc., together and with (1) UHC Defendant controlled companies, (2) pVerify, Inc. controlled companies, (3) one or more current and/or former employees, officers, and directors of All Defendant controlled companies, form an association-in-fact for the common and continuing purpose described herein and constitute and enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of the enterprise who are unknown at this time.

63. Alternatively, the UHC Defendants controlled companies each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

64. Alternatively, the pVerify controlled companies constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

65. Pattern of Racketeering Activity. Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by Defendants regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

66. Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed acts or else aided and abetted such acts.

67. The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they have the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous and are ongoing. There was repeated conduct during a period of time beginning in approximately 2024 and continuing to present, and there is a continued threat of repetition of such conduct.

68. The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate purpose of supplying health insurance related products to Plaintiff and other customers. Defendants have had and do have, upon information and belief, legitimate business plans outside of the pattern of racketeering activity.

69. Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

70. Predicate Act: Use of Mails and Wires to Defraud Plaintiff and Plaintiff's medical providers in Violation of 18 U.S.C. §§ 1341 and 1343. Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Plaintiff and Plaintiff's medical providers to obtain money from Plaintiff and/or Plaintiff's medical providers by means of false or fraudulent pretenses, representations or promises. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. mails or by private commercial interstate carriers, or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications interstate or foreign commerce various writings, signs and signals. The acts of Defendants set forth above were done with knowledge that the use of their mails or wires would follow in the ordinary course of business, or that such use could be foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

71. Defendants carried out their scheme in different states and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme alleged herein, Defendants communicated among themselves and with Plaintiff and Plaintiff's medical providers in furtherance of the scheme

to defraud Plaintiff and Plaintiff's medical providers. These communications were typically transmitted by wire (i.e., electronically) and/or through the U.S. mails or private or commercial carriers.

72. Specifically, pVerify, Inc. Defendant provided UHC Defendants with data, by U.S. mail and/or wire, indicating that Plaintiff had an Aetna policy so that UHC Defendants could defraud Plaintiff and Plaintiff's medical providers by updating UHC Defendants' Coordination of Benefits records in order to deny payment of Plaintiff's medical claims and reprocess previously paid medical claims in order to demand refunds.

73. UHC Defendants then used an automated system with no human review to apply the incorrect match supplied by pVerify, then send correspondence by U.S. mail and/or wire to wrongfully deny payment of Plaintiff's medical claims.

74. UHC Defendants also sent correspondence by U.S. mail and/or wire, in which UHC Defendants knowingly and willfully mispresented material facts to demand repayment from, through deception, Plaintiff's medical providers. UHC Defendants, also by U.S. mail and/or wire, knowingly misrepresented the amounts Plaintiff would owe, in order to defraud Plaintiff.

75. <u>Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. §§ 2314 and 2315.</u> UHC Defendants committed acts constituting indictable offenses under 18 U.S.C. § 2314 in that having devised or intended to devise a scheme or artifice to defraud Plaintiff and/or Plaintiff's medical providers or to obtain money from Plaintiff and/or Plaintiff's medical providers by means of false or fraudulent pretenses, representations or promises, UHC Defendants transported or caused to be transported in interstate or foreign commerce

money having value of $5,000 or more, which was stolen, converted, or taken by fraud. UHC Defendants also committed acts constituting indictable offenses under 18 U.S.C. § 2315 in that they received money in excess of $5,000, which crossed a State or United States boundary after being stolen, unlawfully converted, or taken. Specifically, UHC Defendants accepted payments from Plaintiff's medical providers by U.S. mail and/or wire based on UHC Defendants' knowingly fraudulent misrepresentations made in the demand letters UHC Defendants sent to said medical providers. The acts of UHC Defendants set forth above were done willfully and with knowledge that the money was stolen, converted, or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance the Defendants' scheme or artifice.

76. Continuity of Conduct: Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiff and Plaintiff's medical providers, constituted a continuous course of conduct spanning a period from approximately 2024 through 2026, including present, which was intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5). Shockingly, even after regulatory inquiry and UHC Defendants admissions that the Aetna policy is not associated with Plaintiff, pVerify and UHC Defendants continued and continue this pattern of racketeering activity.

77. The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff. Plaintiff seeks an award of damages in compensation for, among other things, the thousands of dollars Defendants

stole from Plaintiff. Plaintiff accordingly seeks an award of three times the damages sustained by Plaintiff, punitive damages, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## COUNT II

### Breach of Contract v UHC Defendants

78. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

79. UHC Defendants formed an agreement and entered into a contract of insurance ("insurance agreement") with Plaintiff including offer, acceptance, and consideration.

80. Pursuant to that insurance agreement, Plaintiff paid money to UHC Defendants in exchange for UHC Defendants providing a health insurance policy to Plaintiff. UHC Defendants received premiums in exchange for the issuance of a policy of health insurance.

81. The insurance agreement included, without limitation, UHC Defendants' duty to exercise their fiduciary duties to policyholders, abide by applicable state laws, and adequately review and inform policyholders prior to a claim denial.

82. The insurance agreement includes a provision stating: "Commitment of Coverage Decisions. UnitedHealthcare's Clinical Services Staff and Physicians make decisions on the health care services you receive based on the appropriateness of care and service and existence of coverage."

83. Plaintiff performed his obligations under the contract by paying the amounts due under the contract timely.

84. UHC Defendants breached the insurance agreement by, without limitation, failing to keep their promise to fulfill their fiduciary duties to policyholders, abide by applicable state laws, provide a thorough, fair, and objective investigation of each submitted claim prior to a claim denial, and provide written statements to Plaintiff, accurately listing all bases for UHC Defendants' denial of claims and the factual and legal bases for each reason given for such denial.

85. UHC Defendants further breached the agreement by making coverage determinations based solely upon a match made by software and/or AI and/or "Coordination of Benefits" system indicating that Plaintiff may have had a policy with Aetna.

86. UHC Defendants further breached the agreement by failing to perform reasonable investigation into and/or verification of a potential match made by software and/or AI and/or "Coordination of Benefits" system indicating that Plaintiff may have had a policy with Aetna.

87. UHC Defendants automatically denied payment on claims based solely on an incorrect match made by UHC Defendants' software and/or AI and/or "Coordination of Benefits" system which UHC Defendants knew was an incorrect match.

88. As a direct and proximate result of UHC Defendants' breach of contract, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT III

## Breach of the Implied Covenant of Good Faith and Fair Dealing v UHC Defendants

89. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

90. Plaintiff entered into a written insurance agreement with UHC Defendants and that provided for coverage for medical services administered by healthcare providers.

91. Pursuant to the contract, UHC Defendants implied and covenanted that they would act in good faith and follow the law and the contracts with respect to the prompt and fair payment of Plaintiff's claims.

92. UHC Defendants have breached their duty of good faith and fair dealing by, among other things:

a. Improperly delegating their claims and coverage review functions to software and/or AI and/or a "Coordination of Benefits" system which uses an automated process to improperly deny claims;

b. Failing to require their agents to conduct a thorough, fair, and objective investigation of each submitted claim, such as examining patient records, reviewing coverage policies, and using their expertise to decide whether to approve or deny claims to avoid unfair denials.

93. UHC Defendants' practices as described herein violated their duties to Plaintiff a under the insurance contract.

94. UHC Defendants' practices as described herein constitute an unreasonable denial of Plaintiff's rights to a thorough, fair, individualized, and objective investigation of each of their claims in breach of the implied covenant of good faith and fair dealing arising from UHC Defendants' insurance agreements.

95. UHC Defendants' practices as described herein further constitute an unreasonable denial to pay benefits due to Plaintiff in breach of the implied covenant of good faith and fair dealing arising from the UHC Defendants' insurance agreements.

96. UHC Defendants' wrongful denial of Plaintiff's right to a thorough, fair, and objection investigation and a wrongful denial of claims damaged Plaintiff.

97. As a direct and proximate result of UHC Defendants' breaches, Plaintiff has suffered and will continue to suffer in the future, economic losses and other general, incidental, and consequential damages, in amounts according to proof at trial. Plaintiff is also entitled to recover statutory and prejudgment interest against UHC Defendants.

98. UHC Defendants' misconduct was committed intentionally, in a malicious, fraudulent, despicable, and oppressive manner, entitling Plaintiff to punitive damages against UHC Defendants.

## COUNT IV

### Breach of Fiduciary Duty v UHC Defendants

99. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

100. UHC Defendants acted as a fiduciary with respect to the administration of the health insurance plan, and specifically with respect to making decisions regarding the payment, denial, coverage investigation and evaluation, and utilization review of claims for medical benefits, including the claims of the Plaintiff.

101. Duties Owed by a Fiduciary. As a plan fiduciary, UHC Defendants owed Plaintiff and beneficiaries the highest duties recognized by the law, including:

a. The Duty of Loyalty, requiring UHC Defendants to discharge their duties solely in the interest of the plan participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. (29 U.S.C. § 1104(a)(1)(A)).

b. The Duty of Prudence, requiring the UHC Defendants discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity or familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (29 U.S.C. § 1104(a)(1)(B)).

c. The Duty to Follow Plan Documents, requiring UHC Defendants to act in accordance with the documents and instruments governing the plan. (29 U.S.C. § 1104(a)(1)(D)).

102. Breach of Fiduciary Duties. UHC Defendants breached their fiduciary duties of Loyalty and Prudence by engaging in the following acts, among others, with respect to the Plaintiff and the plan:

a. Prioritizing Self-Interest Over Beneficiaries: UHC Defendants developed, adopted, and implemented internal policies, guidelines, and coverage review practices, including those used to deny Plaintiff's claims, that were designed to promote the UHC Defendants' own financial self-interest and reduce costs, rather than to act solely in the interests of the plan participants.

b. Imprudent Coverage Review. UHC Defendants failed to conduct a full and fair investigation into Plaintiff's claims and applicable coverage under the plan,

instead relying on their flawed and self-serving guidelines and processes, constituting a breach of the duty of prudence.

c. Systemic Conduct. The wrongful denial of Plaintiff's claims was not an isolated error, but was part of a systemic, corporate-wide business model and practice of prioritizing profit over the health and contractual rights of their beneficiaries, including Plaintiff.

103. As a direct and proximate result of the UHC Defendants' breach of fiduciary duties, the Plaintiff has suffered and continues to suffer significant harm, including but not limited to, the loss of rightful medical benefits, the imposition of financial liabilities for denied treatment, and other damages, for which Plaintiff seeks the appropriate equitable relief pursuant to (29 U.S.C. § 1132(a)(3)).

104. Relief Sought. Pursuant to (29 U.S.C. § 1132(a)(3), the Plaintiff seeks appropriate equitable relief, including:

a. An Order requiring UHC Defendants to disgorge and restore any and all profits, gains, or unjust enrichment obtained as a result of the wrongful denial of Plaintiff's claims, to be paid as restitution to the Plaintiff.

b. An Order directing UHC Defendants to reform their claims processing procedures and internal coverage guidelines to comply with the law's fiduciary standards and generally accepted coverage evaluation.

c. A Declaration that the UHC Defendants breached their fiduciary duties under the law.

d. An Order awarding the Plaintiff reasonable attorneys' fees and costs pursuant to (29 U.S.C. § 1132(g)).

## COUNT V

### Insurance Bad Faith v UHC Defendants

105. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

106. Plaintiffs hereby assert claims under the insurance bad faith laws of Pennsylvania and New York.

107. Pennsylvania and New York have bad faith insurance common law claims with substantially similar elements and remedies.

108. Pennsylvania and New York prohibit using bad faith or unreasonable means to make coverage determinations under an insurance policy.

109. Plaintiff has standing to pursue a cause of action for insurance bad faith because Plaintiff has suffered an injury in fact, and lost money as a result of UHC Defendants' actions set forth herein.

110. Plaintiff was and is a covered person under the insurance agreements.

111. UHC Defendants used and continue to use software and/or AI and/or the "Coordination of Benefits" system to make coverage determinations in bad faith that should be made by licensed adjusters who conduct a thorough coverage investigation. This bad faith process leads to UHC Defendants unreasonably denying coverage for medically necessary care.

112. UHC Defendants lacked a reasonable basis for using the software and/or AI and/or the "Coordination of Benefits" system to make coverage determinations, ultimately denying policyholders' valid claims. UHC Defendants' use of other patients' policies with other carriers to determine their insureds' coverage without regard for accuracy is unreasonable. A reasonable insurer would not have used the software and/or AI and/or the "Coordination of Benefits" system to deny payment of Plaintiff's claims under the facts and circumstances present.

113. UHC Defendants' denials breach the insurance agreement and are made in bad faith to save money for UHC Defendants' own self-interest. UHC Defendants ignored and continue to ignore clear evidence that the Aetna policy identified by the Defendants' software and/or AI and/or the "Coordination of Benefits" system is clearly not Plaintiff's, while strictly adhering to whatever recommendations the software and/or AI and/or the "Coordination of Benefits" system issued.

114. UHC Defendants' bad faith conduct, as alleged herein, was and continues to be malicious and intentionally designed to deprive Plaintiff of his rights under the insurance agreement. UHC Defendants knew of the dire consequences of denying payment of Plaintiff's claims based on an incorrect match, yet still used the software and/or AI and/or the "Coordination of Benefits" system to deny claims without any reasonable or arguable reason for doing so, recklessly and maliciously disregarding the health and life of Plaintiff.

115. UHC Defendants' denial of Plaintiff's claims was based on the malicious implementation of the software and/or AI and/or the "Coordination of Benefits" system intended to enable UHC Defendants to deny as many claims as possible and to pay out as

little as possible. UHC Defendants' denial of Plaintiff's claims was not the result of an honest disagreement or an innocent mistake.

116. UHC Defendants knew or reasonably should have known that the software and/or AI and/or the "Coordination of Benefits" system was not a suitable substitute for individual review of Plaintiff's coverage and claims and was an inadequate method for deciding coverage applicability and/or to deny claims.

117. UHC Defendants knew or recklessly disregarded that there was no reasonable basis for denying Plaintiff's claims. UHC Defendants' use of the software and/or AI and/or the "Coordination of Benefits" system to make coverage determinations and deny Plaintiff's claims constitutes refusal to pay claims in an arbitrary and capricious manner.

118. By using the software and/or AI and/or the "Coordination of Benefits" system to determine Plaintiff's coverage, UHC Defendants failed to conduct an adequate investigation before denying claims. UHC Defendants did not consider information that was known to UHC Defendants including the full name, address, and social security number of the individual associated with the Aetna policy, and routinely ignored this information even after Plaintiff brought the clear error to UHC Defendants' attention and UHC Defendants' representatives agreed on recorded phone lines and admitted to regulators that the Aetna policy identified by UHC Defendants' software and/or AI and/or the "Coordination of Benefits" system was clearly not a true match.

119. The validity of Plaintiff's claims was readily apparent on its face and would not have been fairly debatable if an adequate investigation had been conducted.

120. UHC Defendants' denials of Plaintiff's claims was based on only *some* of the data from UHC Defendants' software and/or AI and/or the "Coordination of Benefits" system, and not on *all* of the data which adequately confirmed the Aetna policy was not, in fact, issued to or associated with Plaintiff. Consequently, UHC Defendants acted unreasonably in performing their "investigation" of Plaintiff's claims and Plaintiff's coverage, and the denials were not based upon a reasonable interpretation of the insurance agreement.

121. As alleged above, UHC Defendants intentionally breached the implied covenant of good faith and fair dealing by denying Plaintiff the security and peace of mind that is the object of the insurance relationship.

122. UHC Defendants' habitual use of software and/or AI and/or the "Coordination of Benefits" system to deny insurance claims constitutes a general business practice of denying insurance claims without a reasonable basis and/or without a good faith investigation.

123. As a direct result of UHC Defendants' insurance bad faith, Plaintiff has sustained damages in an amount to be determined at trial.

124. UHC Defendants have engaged in insurance bad faith and are liable to Plaintiff for any and all damages that Plaintiff sustained as a result of their bad faith conduct.

125. As a result of UHC Defendants' bad faith conduct, Plaintiff suffered severe emotional distress. Plaintiff did not know whether he would be able to receive necessary care, whether he would be forced to pay out of pocket for said care, or whether he would be financially able to pay for said care, causing severe emotional distress. UHC Defendants' bad faith conduct caused Plaintiff severe mental suffering.

126. Plaintiff's emotional distress caused pecuniary losses, by disrupting Plaintiff's life and schedule, by causing Plaintiff to miss work and/or lose wages, and by other means.

127. UHC Defendants' misconduct was committed intentionally and willfully, in a malicious, fraudulent, wanton, and oppressive manner, entitling Plaintiff to punitive damages against UHC Defendants. UHC Defendants acted with an "evil mind" in wantonly denying Plaintiff's necessary care, causing severe physical and emotional turmoil, to increase their profits. UHC Defendants' conduct constitutes aggravating and outrageous conduct.

128. Plaintiff is entitled to an award of punitive damages based on UHC Defendants' malicious conduct and their intentional and unreasonable refusal to pay claims.

129. UHC Defendants' bad faith conduct is the actual and proximate cause of the damages sustained by Plaintiff.

130. By reason of the conduct of UHC Defendants as alleged herein, Plaintiff has been forced to prosecute the present action. Plaintiffs are therefore entitled to reasonable attorneys' fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

## COUNT VI

### Violation of Pennsylvania's Unfair Insurance Practices Act, 40 P.S. §§ 1171.1, et seq v UHC Defendants

131. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

132. At all times material hereto, UHC Defendants were an insurance company conducting business in the Commonwealth of Pennsylvania and is subject to the provisions of The Pennsylvania Unfair Insurance Practices Act (UIPA), 40 P.S. §§ 1171.1, et seq.

133. Pursuant to 40 P.S. §§ 1171.5(a)(10), “unfair methods of competition” and “unfair or deceptive acts or practices” include specific claim settlement acts when committed by or performed with such frequency as to indicate a general business practice.

134. Defendants violated the provisions of the UIPA, specifically 40 P.S. §§ 1171.5(a)(10) by committing the following unfair claim settlement practices with such frequency as to indicate a general business practice:

a. Misrepresenting pertinent facts or policy or contract provisions relating to the coverage at issue in violation of § 1171.5(a)(10)(ii).
b. Failing to acknowledge and act promptly upon written and/or oral communications with respect to the claims, in violation of § 1171.5(a)(10)(ii).
c. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies, in violation of § 1171.5(a)(10)(iii).
d. Refusing to pay the claims without conducting a reasonable investigation based upon all available information, in violation of § 1171.5(a)(10)(iv).
e. Not attempting in good faith to effectuate prompt, fair, and equitable settlement of the claims in which the UHC Defendants’ liability under the policy had become reasonably clear, in violation of § 1171.5(a)(10)(vi).

135. UHC Defendants' violations of the UIPA demonstrate, individually and collectively, that UHC Defendants lacked a reasonable basis for denying the claims and that they knew or recklessly disregarded their lack of reasonable basis.

136. As a direct and proximate cause of UHC Defendants' unfair and deceptive acts and practices, Plaintiff has been injured and has sustained damages, including financial loss, inconvenience, including attorneys' fees and costs, all of which constitutes evidence in support of Plaintiff's claim for Statutory Bad Faith under 42 Pa. C.S. § 8371.

137. Wherefore, Plaintiff demands judgement against UHC Defendant as further described in the count for Statutory Bad Faith under 42 Pa. C.S. § 8371 for compensatory damages, punitive damages, interest, attorneys' fees, and costs of suit.

**COUNT VII**

**Statutory Bad Faith 42 Pa. C.S.A. § 8371 v UHC Defendants**

138. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

139. UHC Defendants issued the policy, a contract of insurance, to Plaintiff, which established a fiduciary relationship requiring UHC Defendants to act in good faith and fair dealing toward Plaintiff, the UHC Defendants' insured.

140. Pursuant to 42 Pa. C.S.A. § 8371, if a court finds that an insurer has acted in bad faith toward an insured in processing a claim, the court may award, inter alia, punitive damages, attorneys fees' and costs, and interest.

141. UHC Defendants acted in bad faith in their handling and denial of Plaintiffs' claims by:

a. Failing to conduct a full, fair, and objective investigation of the claims within a reasonable time.

b. Ignoring and/or selectively disregarding facts and available information that supported coverage and payment of the claims.

c. Placing their own financial interests above the interests of the insured Plaintiff.

d. Making an unfounded and frivolous refusal to pay the proceeds due under the policy.

e. Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claims when their liability under the policy became reasonably clear.

f. Committing the unfair claim settlement practices, which such frequency as to indicate a general business practice, as set forth in detail in the Fourth Cause of Action, Violation of Pennsylvania's Unfair Insurance Practices Act, 40 P.S. §§ 1171.1, et seq.

142. UHC Defendant insurer did not have a reasonable basis for denying or delaying payment of the benefits owed to the Plaintiff under the policy.

143. UHC Defendant insurer knew and/or recklessly disregarded the fact that it lacked a reasonable basis for denying the claims and engaging in the acts and omissions described herein.

144. UHC Defendants' conduct constitutes bad faith under 42 Pa. C.S.A. § 8371. The acts and omissions of the UHC Defendants were outrageous, wanton, and malicious, justifying the imposition of punitive damages.

145. As a direct and proximate result of the UHC Defendants' bad faith conduct, Plaintiff has been injured and has been forced to institute this litigation to recover benefits owed under the policy, incurring substantial attorneys' fees, costs, and interest.

146. Wherefore, Plaintiff demands judgement against UHC Defendants and respectfully requests that the Court enter an award in Plaintiff's favor for:

a. Damages due under the policy;
b. Punitive Damages in an amount sufficient to punish UHC Defendants and deter similar conduct;
c. Attorneys' Fees and Cost incurred in the prosecution of this action; and
d. Statutory Interest on the amount of the claims from the date the claim was made, in accordance with 42 Pa. C.S.A. § 8371

**COUNT VIII**

**Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1, et seq v all Defendants**

147. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

148. Defendants are "persons" engaged in "trade" and "commerce" as those terms are defined under the Unfair Trade Practices and Consumer Protection Law (UTPCPL) 73 P.S. §201-2.

149. Defendants engaged in "unfair methods of competition" and/or "unfair or deceptive acts and practices" in violation of the UTPCPL, specifically through the "catchall" provision, 73 P.S. §201-2(4)(xxi), by engaging in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding.

150. The fraudulent or deceptive conduct engaged in by Defendants includes, but is not limited to, the following acts, committed both during the sales and marketing process and during the handling of subsequent claims:

a. pVerify, Inc. provided the incorrect match data which UHC Defendants used against Plaintiff and Plaintiff's medical providers.

b. UHC Defendants engaging in the unfair claim settlement practices detailed in the prior Causes of Action, which acts constitute deceptive conduct that misled Plaintiff regarding the availability of benefits.

c. UHC Defendants making false and misleading statements to Plaintiff during the claim adjustment process to confuse or induce Plaintiff to accept less than the amount due under the policy.

151. Plaintiff justifiably relied upon UHC Defendants' deceptive conduct and misrepresentations regarding the policy's coverage and the fair handling of claims, to Plaintiff's detriment.

152. As a direct and proximate result of Defendants' violation of the UTPCPL, Plaintiff suffered an ascertainable loss of money, specifically including the unpaid policy benefits, lost time, and attorneys' fees and costs incurred in enforcing the policy.

153. Wherefore, Plaintiff demands judgement against Defendants and respectfully requests that the Court enter an award in Plaintiff's favor for:

a. Actual Damages;

b. Consequential Damages;

c. Treble Damages, pursuant to 73 P.S. §201-9.2(a);

d. Attorneys' Fees and Costs incurred in the prosecution of this action; and

e. Such other and further relief as the Court deems just and equitable.

**COUNT IX**

**Breach of Implied Covenant of Good Faith and Fair Dealing in Violation of New York Insurance Law § 2601 v UHC Defendants**

154. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

155. As a matter of law, the policy contained an implied covenant of good faith and fair dealing, requiring UHC Defendants to conduct a fair, prompt, and thorough investigation, and to make payment on Plaintiff's claims without reasonable delay, fraud, or deceit.

156. UHC Defendants, as an insurance carrier licensed to do business in the state of New York, is bound by the minimum standards of conduct set forth in the New York Insurance Law, including, but not limited to, N.Y. Insurance Law § 2601 ("Unfair Claim Settlement Practices" / Regulation 64)

157. In handling and denying Plaintiff's claims, UHC Defendants breached the implied covenant of good faith and fair dealing by violating the standards of the New York Insurance Law, and by engaging in a pattern of bad faith conduct, including but not limited to:

a. Faling to adopt and implement reasonable standards for the prompt investigation of Plaintiff's claims, in violation of 11 NYCRR § 216.4(c).

b. Refusing to pay the claims without conducting a reasonable and complete investigation based upon all available information, in violation of 11 NYCRR § 216.6(a).

c. Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claims when, in light of the available information, liability under the policy had become reasonably clear, in violation of § 2601(a)(4).

d. Misrepresenting pertinent facts or policy provisions relating to the coverage at issue, in violation of 11 NYCRR § 216.3.

158. The acts and omissions of UHC Defendants, as alleged herein, constitute a gross disregard of the policyholder's interests and a breach of the implied covenant of good faith and fair dealing.

159. As a direct and proximate result of UHC Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has sustained damages, including the loss of policy benefits, and consequential and extra-contractual damages, and has been forced to incur litigation expenses, to recover benefits justly owed under the policy.

160. Wherefore, Plaintiff demands that judgement against UHC Defendants and respectfully requests that the Court enter an award in Plaintiff's favor for:

a. Damages sufficient to compensate Plaintiff for all losses sustained as a result of the breach;

b. Consequential and Extra-Contractual Damages proximately caused by the gross breach of the implied covenant;

c. Interest on the amounts due;

d. Attorneys' Fees and Costs related to this action; and

e. Such other and further relief as the Court deems just and equitable.

**<u>COUNT X</u>**

**Unjust Enrichment v UHC Defendants**

161. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

162. By delegating the claims review process to the software and/or AI and/or the "Coordination of Benefits" system, UHC Defendants knowingly received funds from Plaintiff and Plaintiff's employer for services that UHC Defendants knew they were not going to deliver. Specifically, by systematically delegating coverage and/or claims determinations to the UHC Defendants' software and/or AI and/or the "Coordination of Benefits" system, UHC Defendants failed to deliver services to Plaintiff. This was done in a manner that was unfair, unconscionable, and oppressive.

163. UHC Defendants knowingly received and retained funds from Plaintiff. In so doing, UHC Defendants acted with conscious disregard for the rights of Plaintiff.

164. As a result of UHC Defendants' wrongful conduct as alleged herein, UHC Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Plaintiff's medical providers.

165. UHC Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

166. Under the common law doctrine of unjust enrichment, it is inequitable for UHC Defendants to be permitted to retain the benefits they received, without justification, from arbitrarily denying their insureds medical payments owed to them under UHC Defendants' policies in an unfair, unconscionable, and oppressive manner. UHC Defendants' retention of

such funds under such circumstances making it inequitable to retain the funds constitutes unjust enrichment.

167. The financial benefits derived by UHC Defendants rightfully belong to Plaintiff. UHC Defendants should be compelled to return to Plaintiffs all wrongful or inequitable proceeds received by UHC Defendants.

168. Plaintiff has no adequate remedy at law.

**COUNT XI**

**Negligence v all Defendants**

169. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

170. As the insurer under the policy, UHC Defendants undertook the duty to investigate and evaluate Plaintiff's claims. This undertaking created a common law duty separate and apart from the duties under the contract, requiring UHC Defendants to exercise reasonable care, skill, and diligence in performing the investigation and evaluation, especially with respect to coverage.

171. UHC Defendants breached this duty of care to Plaintiff by failing to act as a reasonable and prudent insurer would under the circumstances, including but not limited to the following negligent acts and omissions:

a. Failing to conduct a timely, complete, and unbiased investigation into the facts underlying the claim and coverage.

b. Negligently disregarding or misinterpreting material evidence supporting coverage.

c. Employing unreasonably deficient or faulty methods in the evaluation of coverage.

d. Negligently applying or interpreting the terms of the policy, resulting in an unfounded and unreasonable denial of claims.

e. Failing to train or supervise the adjusters and personnel responsible for evaluating coverage and processing and denying the claims.

f. Failing to adequately monitor the software and/or AI and/or the "Coordination of Benefits" system being used to identify other policies, evaluate coverage, and make coverage and claims decisions.

172. pVerify, Inc. Defendant negligently supplied data and/or AI interpretation of data that incorrectly matched the Aetna policy with Plaintiff to UHC Defendants.

173. All Defendants' negligent acts and omissions were the direct and proximate cause of the denial of benefits and resulting damages suffered by Plaintiff.

174. As a direct and proximate result of All Defendants' negligence, Plaintiff has suffered damages, including the failure to receive policy benefits, resulting in financial loss, and expenses incurred to receive the benefits, including attorneys' fees and costs.

175. Wherefore, Plaintiff demands judgement against All Defendants and respectfully requests that the Court enter an award in Plaintiff's favor for :

a. Compensatory Damages sufficient to reimburse Plaintiff for all losses sustained, including the policy benefits and other consequential damages;

b. Interest on the amounts due;

c. Attorneys' Fees and Costs incurred due to Defendants' negligence; and

d. Such other and further relief as the Court deems just and equitable.

**COUNT XII**

**Gross Negligence / Willful and Wonton Misconduct v all Defendants**

176. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

177. UHC Defendants, by undertaking the investigation and evaluation of Plaintiff's claims, owed Plaintiff a common law duty to perform these duties with reasonable care and prudence.

178. UHC Defendants breached this duty by acting with Gross Negligence, which constitutes a willful, wanton, or reckless indifference to the rights and interests of Plaintiff.

179. UHC Defendants' Gross Negligence is evidenced by, but not limited to, the following:

a. Willfully continuing to deny claims despite UHC Defendant's own admissions, findings, or reports on numerous occasions confirming that coverage existed under the policy and that the Aetna policy identified by the UHC Defendants' software and/or AI and/or the "Coordination of Benefits" system was clearly not Plaintiff's policy and thus not applicable.

b. Knowingly misrepresenting or suppressing the internal findings and conclusions that favored coverage for Plaintiff.

c. Engaging in conduct calculated to delay payment, compel litigation, and deprive Plaintiff of benefits that the UHC Defendants knew or recklessly disregarded were owed.

d. Exhibiting reckless indifference to the legal duties and standards of care required of an insurer.

180. pVerify, Inc. Defendant grossly negligently supplied data and/or AI interpretation of data that incorrectly matched the Aetna policy with Plaintiff to UHC Defendants, upon information and belief, even after the erroneous data was brought to their attention.

181. All Defendants' actions were not merely negligent, but were so egregious as to demonstrate a conscious and deliberate disregard for the rights of the Plaintiff.

182. As a direct and proximate result of All Defendants' Gross Negligence, Plaintiff has suffered significant damages, including the loss of policy benefits, resulting financial losses, emotional distress, and the cost of litigation.

183. Due to the egregious and reckless nature of All Defendants' conduct, Plaintiff is entitled to an award of punitive damages against the Defendants in an amount sufficient to punish the Defendants and deter similar conduct in the future.

184. Wherefore, Plaintiff demands judgement against All Defendants and respectfully requests that the Court enter an award in Plaintiff's favor for:

a. Compensatory Damages sufficient to compensate Plaintiff for all losses sustained, including policy benefits and consequential damages;

b. Punitive Damages against Defendants in an amount to be determined by the trier of fact;

c. Interest on the amounts due;

d. Attorneys' Fees and Costs related to this action; and

e. Such other and further relief as the Court deems just and equitable.

## COUNT XIII

### Negligence Per Se v UHC Defendants

185. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

186. The Commonwealth of Pennsylvania has established detailed regulations for the handling of insurance claims, including but not limited to, the Unfair Insurance Practices Act (40 P.S. §§ 1171.1, et seq.) and the implementing regulations at 31 Pa. Code Ch. 146 (Unfair Claim Settlement Practices).

187. These statutes and regulations establish the standard of conduct and minimum duties owed by insurers to their policyholders in the investigation and settlement of claims, intended to protect insureds like the Plaintiff from financial loss due to unfair or dilatory claim practices.

188. UHC Defendants violated the aforementioned statutes and regulations, and therefore was negligent per se, by engaging in the following conduct, which constitute violations of the mandatory standard of care:

a. Failing to adopt and implement reasonable standards for the prompt investigation of claims (31 Pa. Code § 146.6).

b. Refusing to pay the claim without conducting a reasonable investigation based upon all available information (40 P.S. § 1171.5(a)(10)(iv)).

c. Failing to attempt in good faith to effectuate prompt, fair, and equitable settlement of the claims where liability under the policy had become reasonably clear (40 P.S. § 1171.5(a)(10)(vii)).

d. Violating other mandatory provisions of the UIPA and 31 Pa. Code Ch. 146 as alleged herein.

189. Plaintiff belongs to the class of persons (injured) that these statutes and regulations were designed to protect, and the harm suffered by Plaintiff (denial of benefits, financial loss) is the type of harm the laws were designed to prevent.

190. UHC Defendants' violations of these statutes and regulations constitute negligence per se and were the direct and proximate cause of the damages suffered by Plaintiff.

191. As a direct and proximate result of UHC Defendants' negligence per se, Plaintiff has suffered damages, including financial loss, expenses incurred to secure the benefits, and other consequential losses.

192. Wherefore, Plaintiff demands judgement against UHC Defendants and respectfully requests that the Court enter an award in favor of Plaintiff for:

a. Compensatory Damages sufficient to reimburse Plaintiff for all losses sustained, including the policy benefits;
b. Interest on the amounts due;
c. Attorneys' Fees and Costs incurred due to Defendants' conduct; and
d. Such other and further relief as the Court deems just and equitable.

## COUNT XIV

### Fraud (Common Law) vs All Defendants

193. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

194. All Defendants had a duty to conduct their business, including UHC Defendants' handling of claims, in an honest and truthful manner.

195. UHC Defendants made a misrepresentation of material fact to the Plaintiff when they formally denied payment on the claims in writing on or about the date of every EOB issued in relation to a claim which UHC Defendants denied payment on and subsequently continued to assert that Aetna was primary over the policy Defendants issued to Plaintiff in exchange for premiums, and for every demand letter UHC Defendants sent to Plaintiff's medical providers for reimbursement. This representation, which claimed the denial of payment was based on a good faith investigation and interpretation of the policy, was false.

196. pVerify, Inc. Defendant, upon information and belief, made material misrepresentations with their data and/or AI interpretation of the data to assert that Plaintiff had an Aetna policy and that UHC Defendants then used against Plaintiff.

197. UHC Defendants made misrepresentations of material facts to the New York Department of Financial Services when they formally responded on December 12, 2024 regarding Plaintiff's formal complaint # CSB-2024-01624346, wherein UHC Defendants represented to New York's Department of Financial Services that they had resolved the issue and reviewed all claims and confirmed that no other claims were impacted from this error, despite there being at least two prior claims they had denied payment on for the same basis which remained uncorrected at that time. This representation was materially and patently false.

198. UHC Defendants made misrepresentations of material facts to Plaintiff on October 11, 2025, wherein they claimed to have re-reviewed a claim at Plaintiff's request and

represented that the claim was previously processed correctly since UHC Defendants' were primary over Aetna. This representation is materially and patently false as evidenced by the original EOB dated October 6, 2025, which clearly indicates that UHC Defendants declined to make payment because UHC Defendants' records show that Plaintiff has primary coverage with Aetna.

199. UHC Defendants made misrepresentations of material facts to Plaintiff on August 25, 2026, wherein they claimed to have re-reviewed a claim at Plaintiff's request by way of appeal, including the documentation submitted by Plaintiff. This representation is materially and patently false as evidenced by the fact that they did not properly reprocess the claim.

200. UHC Defendants made misrepresentations of material facts to Plaintiff and regulators throughout the 2024 to 2026 and current period as evidenced by promises that a fix had been put in place yet the issue persists, and promises that claims had been reprocessed correctly only to be discovered by Plaintiff that they had not, in fact, been reprocessed correctly.

201. UHC Defendants knew the representations were false, or made it with reckless disregard for its truth or falsity, because UHC Defendants own internal documents, reports, and communications including but not limited to, the "Coordination of Benefits" system and internal note system in or about July 2024, August 2024, December 2024, and October 8, 2025, and throughout 2026 had already admitted, concluded, or otherwise established that coverage existed on a primary basis for Plaintiff's claims and that the Aetna policy was not, in fact, associated with Plaintiff.

202. UHC Defendants made these false and misleading representations with the intent to induce the Plaintiff to alter his position – specifically, to discourage the Plaintiff from pursuing the claims, compel the Plaintiff to accept the inadequate settlement, or incur significant litigation costs to obtain the benefits rightfully owed.

203. Plaintiff justifiably relied upon UHC Defendants' representations that the processing of claims was based on a good-faith coverage investigation and determination, and as a direct result, Plaintiff was compelled to institute this litigation, thereby incurring significant damages, financial losses, and other expenses.

204. As a direct and proximate result of All Defendants' intentional and fraudulent conduct, Plaintiff has suffered significant financial and consequential damages.

205. Because All Defendants' actions were willful, malicious, and constituted an intentional deception designed to mislead Plaintiff for All Defendants' financial gain, Plaintiff is entitled to an award of Punitive Damages against All Defendants.

206. Wherefore, Plaintiff demands judgement against All Defendants and respectfully requests that the Court enter an award in favor of the Plaintiff for:

a. Compensatory Damages sufficient to compensate Plaintiff for all losses sustained, including policy benefits and consequential damages;
b. Punitive Damages against All Defendants in an amount to be determined by the trier of fact;
c. Interest on the amounts due;
d. Attorneys' Fees and Costs related to this action;
e. Such other and further relief as the Court deems just and equitable.

**COUNT XV**

**Civil Conspiracy v All Defendants**

207. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

208. All Defendants, acting through and in concert with their agents, employees, adjusters, and/or third-party vendors (collectively, "Co-Conspirators"), formed a combination or agreement to commit and unlawful act or lawful act by unlawful means.

209. The unlawful purpose of this combination was to knowingly commit the torts of Fraud and Statutory Bad Faith against Plaintiff by:

a. Willfully misrepresenting the scope of the coverage and/or findings of the investigation.

b. Recklessly disregarding the UHC Defendants' own internal reports and conclusions that established that coverage existed on a primary basis under the policy UHC Defendants issued to Plaintiff and that the Aetna policy was not, in fact, associated with Plaintiff.

c. Unlawfully and fraudulently withholding payment of policy benefits and causing Plaintiff to incur unnecessary financial and litigation expenses.

210. All Defendants and their Co-Conspirators engaged in overt, tortious acts in furtherance of this conspiracy, including but not limited to:

a. Concealing or suppressing internal documents that confirmed coverage on a primary basis and/or knowledge of the incorrect data and/or AI interpretation.

b. Coordinating the language in correspondence to Plaintiff obscure the denial of payments and/or the true reason for the denial of payments by UHC Defendants.

c. Issuing the formal written denial of payments on or about the date of every EOB issued in relation to a claim which UHC Defendants denied payment on, UHC Defendants' December 12, 2024 response to New York Department of Financial Services, UHC Defendants' October 11, 2025 letter to Plaintiff stating they will not reprocess the claim in question because it was already processed as primary coverage despite the EOB directly contradicting this and despite knowledge of the claims' validity and that coverage under the policy that Defendants issued to Plaintiff in exchange for premiums was on a primary basis, and UHC's August 25, 2026 letter to Plaintiff refusing to reprocess the claim in question because it was processed correctly already despite UHC Defendants' admission that the April 7, 2026 claim was reprocessed incorrectly thereby causing the claim being appealed to be improperly applied to co-insurance/deductible, causing Plaintiff financial harm.

211. The actions of All Defendants and their Co-Conspirators, acting within the scope of their unlawful agreement, were willful, intentional, malicious, and done with the specific purpose of harming the Plaintiff.

212. As a direct and proximate result of the Civil Conspiracy, Plaintiff has suffered significant damages, including loss of policy benefits, consequential damages, including the loss of policy benefits, consequential financial losses, and the expenses of this litigation.

213. Due to the willful, wanton, and reckless nature of this conspiracy, Plaintiff is entitled to an award of Punitive Damages against All Defendants and Co-Conspirators in an amount sufficient to punish them and deter similar conduct in the future.

214. Wherefore, Plaintiff demands judgement against All Defendants and respectfully requests that the Court enter an award in Plaintiff's favor for:

a. Compensatory Damages sufficient to compensate Plaintiff for all losses sustained, including policy benefits and consequential damages;
b. Punitive Damages against All Defendants in an amount to be determined by the trier of fact;
c. Interest on the amounts due;
d. Attorneys' Fees and Costs related to this action; and
e. Such other and further relief as the Court deems just and equitable.

## COUNT XVI

### Negligent Infliction of Emotional Distress v All Defendants

215. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

216. By issuing the policy and undertaking the claim investigation, the UHC Defendants assumed a duty of reasonable care toward the Plaintiff to process, investigate, and evaluate the claims fairly and competently.

217. This duty of care was established by the special relationship between the insurer and the insured, which arises from the policy's fiduciary or confidential nature, and the regulatory mandates of the Commonwealth of Pennsylvania, including 31 Pa. Code Ch. 146.

218. UHC Defendants breached this duty of care by acting negligently in the following manner, which is separate and apart from the breach of contract:

a. Failing to conduct a reasonable, impartial, and complete investigation.

b. Negligently disregarding internal evidence and admissions supporting coverage on a primary basis.

c. Negligently implementing claim settlement procedures, which are supposed to be designed to protect policyholders.

219. It was reasonably foreseeable to UHC Defendants that the negligent mishandling and denial of payment on Plaintiff's claims would cause the Plaintiff to suffer serious and debilitating emotional distress, given the financial and personal importance of the policy benefits.

220. pVerify, Inc. Defendant negligently supplied data and/or AI interpretation of data that incorrectly matched the Aetna policy with Plaintiff to UHC Defendants. It was reasonably foreseeable to pVerify, Inc. that negligently providing incorrect data and/or AI interpretation of that data to incorrectly match policies to the wrong individuals would harm Plaintiff as pVerify, Inc. was aware UHC Defendants' purpose of retaining pVerify, Inc.'s services was to identify other policies so that UHC Defendants could deny payment on claims, as has occurred in Plaintiff's case.

221. As a direct and proximate result of the All Defendants' negligence, Plaintiff suffered severe emotional distress and/or exacerbation of pre-existing conditions, including but not limited to, generalized distress, anxiety, depression, insomnia, financial instability, emotional anguish, and loss of sleep requiring medical treatment and counseling.

222. Wherefore, Plaintiff demands judgement against All Defendants and respectfully requests that this Court enter an award in Plaintiff's favor for:

a. Compensatory Damages for the emotional distress suffered;

b. Interest on the amounts due;

c. Attorneys' Fees and Costs related to this action; and

d. Such other and further relief as the Court deems just and equitable.

**COUNT XVII**

**Intentional Infliction of Emotional Distress v all Defendants**

223. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

224. All Defendants' conduct, as described herein, including the UHC Defendants' intentional and willful continuation of claims denials despite internal knowledge and admissions that coverage exists on a primary basis, was extreme and outrageous in character.

225. Said conduct was carried out by All Defendants and their agents and employees with the intent to cause severe emotional distress to the Plaintiff, or with reckless disregard of the high probability that severe emotional distress would result from such conduct.

226. The specific acts, including but not limited to UHC Defendants' December 12, 2024 response to New York's Department of Financial Services claiming that no other claims had been impacted despite clear evidence to the contrary, UHC Defendants' October 11, 2025 correspondence responding to Plaintiff's requests to reprocess a claim in which Defendants' claimed it was processed correctly as primary despite the EOB clearly indicating the exact

opposite of what UHC Defendants' represented, and UHC Defendants' August 25, 2026 letter to Plaintiff refusing to reprocess the claim in question because it was processed correctly already despite UHC Defendants' admission that the April 7, 2026 claim was reprocessed incorrectly thereby causing the claim being appealed to be improperly applied to co-insurance/deductible, go beyond the bounds of decency and are regarded as atrocious and utterly intolerable in a civilized society.

227. As a direct and proximate result of All Defendants' extreme and outrageous conduct, Plaintiff has suffered severe and debilitating emotional distress and/or exacerbation of pre-existing conditions, including but not limited to, generalized distress, depression, insomnia, financial instability, anxiety, emotional anguish, and loss of sleep requiring medical treatment and counseling.

228. Because All Defendants' actions were intentional, malicious, and designed to inflict financial and emotional harm upon the Plaintiff, the Plaintiff is entitled to an award of Punitive Damages against All Defendants.

229. Wherefore, Plaintiff demands judgement against All Defendants and respectfully requests the Court enter an award in Plaintiff's favor for:

a. Compensatory Damages for the severe emotional distress suffered;
b. Punitive Damages against All Defendants in an amount determined by the trier of fact;
c. Interest, Attorneys' Fees, and Costs related to this action; and
d. Such other and further relief as the Court deems just and equitable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Christopher O'Brien-Visser, demands injunctive relief and judgement against Defendants OXFORD HEALTH INSURANCE, INC., UNITEDHEALTH GROUP, INC., UNITEDHEALTHCARE, INC., and pVerify, Inc., inclusive and respectfully requests that this Honorable Court enter judgement in Plaintiff's favor and grant relief as follows:

1. Contractual Damages: An award of compensatory damages in an amount sufficient to cover all benefits rightfully due and owing to Plaintiff under the insurance policy, plus applicable statutory interest.
2. Consequential and Extra-Contractual Damages: An award of damages for all economic losses and expenses suffered by Plaintiff that were proximately caused by Defendants' wrongful conduct, including, but not limited to, losses resulting from financial instability caused by the denial of payments, and other out-of-pocket expenses.
3. Emotional Distress Damages: An award of damages for the severe emotional distress, pain, suffering, and mental anguish caused by the Defendants' extreme, outrageous, and reckless conduct, as fully outlined in the Counts above.
4. Punitive Damages: An award of Punitive Damages against the Defendants and any Co-Conspirators, in an amount determined by the trier of fact to be sufficient to punish Defendants for their willful, wanton, malicious, fraudulent, grossly negligent, and bad faith conduct, and to deter the Defendants and others from similar misconduct in the future.

5. Treble Damages (UTPCPL): An award of up to three times the actual damages sustained by the Plaintiff, pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. § 201-9.2), as fully detailed in the Counts above.
6. Attorneys' Fees and Costs: An award of reasonable attorneys' fees and costs of litigation
7. Pre- and Post-Judgement Interest: An award of pre-judgment interest (including the three percent (3%) statutory addition allowed under the Bad Faith Statute) and post-judgement interest on all amounts recovered.
8. Appropriate declaratory and injunctive relief enjoining Defendants from continuing their improper and unlawful practices as set forth herein.
9. Other Relief: Such other and further relief, both legal and equitable, as this Honorable Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Plaintiff demands a jury trial on all triable issues.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 31 day of August, 2026.

Signature of Plaintiff Christopher O'Brien-Visser

Mailing Address 400 Nail Works Street

Phoenixville, PA 19460

Telephone 610-551-6173

E-mail c.obrienvisser@gmail.com